FILED by____**MM**____ D.C.

**Oct 12, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## 22-60210-CR-SINGHAL/DAMIAN

CASE NO. _____

18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1349
26 U.S.C. § 7206(1)
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)

UNITED STATES OF AMERICA

v.

DOUGLAS SAILORS,

              Defendant.

_____/

## INDICTMENT

The Grand Jury charges that:

## COUNT 1

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### Background

**A.**    **Formation of the Charities**

1.    On February 28, 2007, at the direction of defendant DOUGLAS SAILORS (hereinafter referred to as "SAILORS"), Disabled Veterans Services, Inc. (DVS) was formed as a corporation in the state of Tennessee. On August 2, 2011, DVS applied for authorization to conduct its affairs in Florida. DVS was an alleged non-profit charitable organization that obtained tax-exempt status with the Internal Revenue Service (IRS). The stated mission of DVS was to

1

promote charity, education and charitable causes by assisting United States Military Veterans in their education, training, employment and general assimilation into civilian life.

2.      On or about May 20, 2009, Seven Sisters of Healing, Inc. (hereinafter referred to as "Seven Sisters") was formed at the direction of defendant SAILORS.  It was formed as an alleged non-profit charitable organization.  Seven Sisters obtained tax-exempt status with the IRS in or about 2009.   In or about 2011, at SAILORS' direction, Seven Sisters changed its name to Community Charity Advancement, Inc. (hereinafter referred to as "CCAI").  CCAI registered the following fictitious names: Breast Cancer Research and Support Fund, United States Firefighters Association, and U.S. Volunteer Firefighters Association.  In the Articles of Incorporation, the stated mission purpose of CCAI was to provide health care services and products and related assistance to those in need in the United States and Central and South America; to provide assistance to victims of fire, storm and other natural disasters, and to further other charitable and educational purposes as described in Section 501(c)(3) of the Internal Revenue Code.

3.      In or about July 2012, National Community Advancement, Inc., (hereinafter referred to as "NCA") was formed at the direction of Defendant SAILORS in Delaware.  In or about March 2016, NCA applied for authorization to conduct its affairs in Florida as a not-for-profit corporation.  In its application, NCA set forth its stated purpose as "charitable/breast cancer awareness & prevention."

B.      **Formation of the Charity Management Companies**

4.      In or about 2005, F.U.M. Management Corporation (hereinafter referred to as "FUM"), was incorporated in Nevada at the direction of defendant SAILORS.  From in or about 2007 through in or about 2014, FUM was utilized as a purported charity management company to

allegedly manage the operations of DVS, Seven Sisters, and CCAI (hereinafter collectively referred to as "the Charities").

5.      Defendant SAILORS' relative (hereinafter referred to as "Individual 1") was the chairman and president of record of FUM beginning at least as early as September 21, 2009.

6.      Beginning in or about March 2014, FUM changed its name to Associated Charity Management (hereinafter referred to as "ACM").  In or about May 2014, defendant SAILORS, through interstate wire and electronic communications, directed that a nominee (hereinafter referred to as the "Nominee President") be listed as the chairman and president of record of ACM. The Nominee President understood that he would act solely in accordance with the directions of defendant SAILORS. The Nominee President had minimal interaction with the Charities.  The Nominee President was used by defendant SAILORS to conceal defendant SAILORS' participation the Charities and the Charity Management Companies.

7.      In or about 2006, HMDM Management, Inc. (hereinafter referred to as "HMDM") was incorporated in Nevada at the direction of defendant SAILORS.  It was a management company whose voting stock was owned by the SO Trust and the Palmer Trust.  Defendant SAILORS and/or Individual 1 owned and/or controlled both the SO Trust and the Palmer Trust. Defendant SAILORS directed that the Nominee President of ACM also be listed as the president of HMDM.

8.      On April 13, 2016, an officer/director for HMDM filed in Nevada a "Fictitious Firm Name" for HMDM.  The officer/director certified that HMDM was conducting business under the fictitious name Nurse Placement International (hereinafter referred to as "NPI").

C.      **Regulations regarding the operation of charitable organizations**

9.      Charitable organizations which solicit donations are governed by certain State and Federal laws and regulations.  For example, a charitable organization which intends to solicit contributions in or from the state of Florida must file an initial registration statement, and a renewal statement annually thereafter, with the Florida Department of Agriculture and Consumer Services. § 496.405(1), Fla. Stat. (2014).  A charitable organization may solicit contributions only for the purpose expressed in the solicitations for contributions or the registration statement and may apply contributions only in a manner substantially consistent with that purpose.  § 496.411(1), Fla. Stat. (2014).

10.      An individual being solicited may request a written financial statement about the charitable organization.  Among other things, the written financial statement must state the purpose for which funds are raised, the total amount of all contributions raised, the total costs and expenses incurred in raising contributions, and the total amount of contributions dedicated to the stated purpose or disbursed for the stated purpose.  § 496.411(2)(e), Fla. Stat. (2014).

11.      State and Federal regulations regarding the establishment, operation and management of charity activities exist to ensure the lawful conduct of charitable organizations and to allow potential donors the ability to make an informed decision prior to contribution.

12.      A charitable organization's **Board of Directors** has three primary legal duties.

A.      Duty of Care – Care of the nonprofit entity by ensuring prudent use of all assets, including facility, people, and of good will;

B.      Duty of Loyalty – Ensure that the non-profit's activities and transactions are advancing its mission, recognize and disclose conflicts of interest and make decisions that are in the best interest of the non-profit entity (not in the interest of the individual board member); and

4

C.   Duty of Obedience – Ensure that the non-profit entity obeys applicable laws and regulations, follows its own by-laws and adheres to its stated mission/purpose.

13.   A charitable organization's **Officers** are elected or appointed by the board of directors.

A.   An officer's responsibility is to carry out the non-profit entity's day to day business within the scope of their delegated authority.

B.   The officers of a non-profit entity are the agents through which the board of directors act.

D.   **Tax-Exempt Status - The IRS**

14.   Charitable organizations seek tax-exempt status from the Internal Revenue Service which entitles the charities to certain benefits, including not having to pay any federal income tax and allowing every donor to claim a tax deduction for contributions to the charitable organization. A tax-exempt organization must be organized exclusively for exempt purposes and must not be organized or operated for the benefit of private interests.

15.   A charitable organization can obtain tax-exempt status by filing IRS Form 1023, the Application for Recognition of Exemption, under Section 501(c)(3) of the Internal Revenue Code, which requires the identification of the applicant, and a listing of officials, board of directors and trustees.

16.   A charitable organization that obtains tax-exempt status that has gross receipts exceeding $50,000 is required to file a Form 990 every year with the IRS, which provides the IRS an overview of the charitable organization's yearly activities.  This information includes a description of the charitable organization's primary exempt purpose, program service accomplishments, and disclosure of financial details on revenue, expenses, assets and liabilities.

The financial details include the percentage of donations received by the charitable organization that goes to furthering the mission of the charitable organization, otherwise called the program services, and conversely the percentage of donations received that pay administrative expenses, such as salaries and management and other fees paid to persons operating the charitable organization.

17.     IRS Form 990 is a public document intended for use by potential donors in order that informed decisions can be made as to whether to donate to a charitable organization.

18.     In or about 2015, the IRS revoked the tax-exempt status of DVS based upon the failure to demonstrate that DVS was operating for exempt purposes.

E.     **Disqualified Persons**

19.     Any person who is in a position to exercise substantial influence over the affairs of a tax-exempt organization is referred to by the IRS as a disqualified person.  A disqualified person includes anyone who, regardless of title, is in charge of implementing decisions of the governing body and anyone who, regardless of title, is in charge of managing the organization's finances. Certain disclosures are required for disqualified persons.

20.     A disqualified person who receives any money in exchange for services or property of a tax-exempt charitable organization cannot receive in excess of the fair market value for the services or property, otherwise the disqualified person must pay an excess benefits tax equal to 25% of the payment in excess of fair market value.  The disqualified person receiving the excess benefit must correct, that is, pay back, the excess benefit within the taxable period, otherwise a tax equal to 200% of the excess benefit is imposed.  All excess benefits must be reported by the charitable organization on the IRS Form 990 for the year paid, and the disqualified person must pay back the excess benefit.

F.    **Additional Obligations of Charitable Organizations**

21.    The Attorney General's Office for each state has the responsibility for overseeing the propriety of the activities undertaken by charitable organizations operating in their state.

22.    As is set forth above, every charitable organization that solicits contributions in or from the state of Florida is required to annually file information regarding the board members and the nature of the charitable organization's operations.  The annual filing is made with the Florida Department of Agriculture and Consumer Services.  In these filings, a charitable organization is required to disclose whether any of its officers, directors, trustees, or employees have been convicted of, or found guilty of, or pled guilty to, or been incarcerated within the last ten years for any felony.  It also requires the charitable organization to disclose whether any of its officers, directors, trustees, or employees have been convicted of, or found guilty of, or pled guilty to, or been incarcerated within the last ten years for any crime involving fraud.  §§ 496.405(2)(d)5 and 496.405(2)(d)6, Fla. Stat. (2014).  A charitable organization may not knowingly allow an officer, director, trustee, or employee to solicit contributions on behalf of such organization if such officer, director, trustee, or employee has been convicted of, or found guilty of, or pled guilty to, or been incarcerated within the last ten years for any felony, or any crime involving fraud.   § 496.405(8), Fla. Stat. (2014).

G.    **Defendant SAILORS' Criminal Convictions**

23.    In or about January 1999, defendant SAILORS was convicted of a felony involving fraud.

24.    In or about October 1999, defendant SAILORS was convicted of a felony involving fraud and was released from incarceration on or about June 2002.

H.    **Charitable Solicitations**

25.    All the cash donations made to the Charities were as a result of telephone solicitations made by call centers hired by the Charities at the direction of defendant SAILORS.

26.    The Charities primarily used one call center service (hereafter referred to as the "Charity Solicitor"), which was located in Las Vegas, Nevada and had telephone solicitors located in Honduras, the Philippines, and Guatemala. The Charity Solicitor wrote the solicitation speeches on behalf of the Charities and employed hundreds of telephone solicitors who placed telephone calls in interstate and foreign commerce to potential donors seeking cash donations on behalf of the Charities. The Charity Solicitor placed the donated monetary proceeds in the Charities' bank accounts.

27.    In return for its services, the Charity Solicitor received approximately 87 ½ percent of all the cash donations sent to the Charities and the Charities received the remaining 12½ percent.

I.    **Gifts-In-Kind**

28.    In addition to cash donations, a charitable organization may also receive and distribute goods.   These goods are referred to as gifts-in-kind.

29.    The charitable organizations receiving the gifts-in-kind can distribute them to other charitable organizations that agree to donate the goods consistent with the restrictions set forth by the manufacturers and the mission of the donating charitable organization.  For example, pharmaceutical manufacturers donate excess goods, such as pharmaceutical medications, that are near expiration or otherwise are no longer for sale to the public.  In many cases, these goods are donated to the charitable organization with restrictions, such as the goods cannot be resold or are forbidden from being distributed in the United States.

30.     If the charitable organization obtains custody and control over the goods, the tax laws allow a charitable organization to include in revenue and subtract as a deduction the gifts-in-kind they receive and distribute consistent with their stated mission.   Because individuals being solicited can request information about the total amount of contributions being disbursed for the stated charitable purpose, charitable organizations that distribute a low percentage of their cash donations will utilize gifts-in-kind to increase the percentage of revenues (hereinafter referred to as the "Ratio") disbursed to further the mission of the charitable organization.

J.     **Hiring of Professionals**

31.     Defendant SAILORS retained the services of professionals, including lawyers, accountants, and bookkeepers on behalf of the Charities to allegedly assist defendant SAILORS and the Charities in collecting and disbursing the cash donations, handling the administrative tax filings, preparing legal opinions, and responding to the investigative and administrative agencies and civil litigation.  Such professionals were paid by defendant SAILORS to facilitate the fraud.

K.     **Douglas W. Sailors' Defined Benefit Plan**

32.     In or about 2009, DOUGLAS SAILORS formed the Douglas W. Sailors' Defined Benefit Pension Plan.  The purpose of a defined benefit plan is for an individual or an entity to contribute to a retirement plan while they work and to preserve and increase the amounts contributed by making prudent investments, in order for the individual to be able to utilize those funds after retirement.

L.     **Political Action Committees**

33.     A political action committee (hereinafter "PAC") is an organization that pools campaign contributions from donors and donates those funds to campaigns for or against candidates, ballot initiatives, legislation, ideological missions and single interest groups.

34.     PACs can be established by the filing of a form with the Federal Election Commission (FEC) that principally identifies the PAC's name, physical address, email address, internet website and association with a banking institution.

35.     The FEC is an agency of the U.S. Government responsible for regulating, among other things, political committees funded to support candidates for federal elected office and political candidates through fundraising and expenditures. The FEC is responsible for receiving and making available to the public specific, accurate information about the amounts and sources of political contributions.

36.     Each PAC is required to file a statement of organization which contains information including the name, address, and type of committee and the name and address of the treasurer of the committee.

37.     Unlike charities, PACs are not regulated by the Offices of the State Attorney General, nor are they subject to reporting requirements and/or scrutiny by the State Attorney Generals.

38.     Defendant SAILORS established the PACs used in the above-described charity solicitation call centers to solicit donations. The same solicitation procedures and mechanisms were used to solicit funds.

39.     Defendant SAILORS caused the establishment of a purported PAC management company, Management International, Inc., as a mechanism to fraudulently access the donations.

40.     Defendant SAILORS solicited individuals to act as president and/or treasurer of the PACs, including defendant SAILORS' family members. Defendant SAILORS selected these individuals based upon their inexperience and willingness to comply with defendant SAILORS' instructions.

41.     At the direction of defendant Sailors, PACs were established, including the National Assistance Committee, which does business as the National Breast Cancer Committee, the National Firefighter's Committee, the National Troopers and Police Committee, and the National Veteran's Committee.

42.     The officers and agents of the PACs were nominees solicited by defendant Sailors to conceal his participation in the fraudulent activity.

## COUNT ONE

### Conspiracy to Commit Mail Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.     The allegations set forth in the General Allegations Section are hereby re-alleged and expressly incorporated as if set forth herein.

2.     Beginning at least in or about 2009 and continuing through in or about 2018, in Broward County, in the Southern District of Florida and elsewhere, the defendant,

**DOUGLAS SAILORS,**

knowingly and willfully combined, conspired, confederated, and agreed with others known and unknown to the Grand Jury to commit an offense against the United States, that is,

a.     to devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing, and attempting to execute, such scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to knowingly cause to be delivered by United States mail and by commercial interstate carrier according to the directions thereon, certain matters and things, in violation of Title 18, United States Code, Section 1341 (Mail Fraud); and

11

b.      to devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

## PURPOSE AND OBJECTIVE OF THE CONSPIRACY

3.      It was the purpose and objective of the conspiracy that the defendant and his co-conspirators would unlawfully enrich themselves by controlling the officers and boards of directors of the Charities and the PACs so that they could direct the transfer and payment of monies which had been donated to the Charities and the PACs to businesses owned or controlled by the defendant or his co-conspirators; and to conduct acts of obstruction and concealment in order to enable the scheme to continue.

All in violation of Title 18, United States Code, Section 1349.

## MANNER AND MEANS

A.      **Forming the Charities for the Defendant's Personal Benefit**

4.      Defendant SAILORS facilitated the creation and establishment of the Charities and management companies and, in so doing, he used nominees in order to conceal his true control over the activities of the Charities and management companies.

5.      In order to maintain control of the Charities, defendant SAILORS hand-picked individuals known to him to be inexperienced and uninformed in the operation and management

of charities, to serve as officers and board members of the Charities. Defendant SAILORS made false statements to these individuals about his background and experience.

6.     Defendant SAILORS had ultimate responsibility for decisions made on behalf of the Charities and exercised unfettered control over the affairs of the Charities for his personal benefit and in furtherance of the fraud scheme.

7.     Defendant SAILORS drafted the mission statements for many of the Charities in order to fraudulently make the Charities appear to be engaged in legitimate socially beneficial activities.  The mission statements were designed to appeal to donor's compassion and goodwill. The mission statements were further designed to allow defendant SAILORS to obtain gifts-in-kind in order to corruptly increase the Ratio of the Charities' donations.

8.     Defendant SAILORS hired an accountant and bookkeeper for the Charities but engaged in activities through interstate wire and electronic communications designed to conceal from them and others the fraudulent nature of his conduct.

9.     Defendant SAILORS hired the Charity Solicitor without conducting any due diligence regarding the propriety of the Charity Solicitor's fees.   The Charity Solicitor directed the employees to place telephone solicitation calls to individuals throughout the United States. The telephone solicitors utilized a script written by the Charity Solicitor in order to solicit donations.

10.     Defendant SAILORS exercised complete control over the officers and directors of the Charities to such an extent that the officers and directors of the Charities failed to exercise their fiduciary duty to provide oversight, control, direction, operation, and supervision of the Charities.

11.     In the absence of independent and informed officers and board members, defendant SAILORS defrauded the Charities by using the Charities for his personal benefit and not in accordance with applicable state laws and not for the benefit of the public.

B.     **Utilizing Management Companies to Defraud**

12.     Defendant SAILORS established and controlled FUM, ACM, and HMDM (hereinafter collectively referred to as the "Management Companies"). Defendant SAILORS utilized nominees, including the Nominee President and Individual 1, in order to conceal his participation in the Management Companies. Defendant SAILORS also utilized the Nominee President to insulate himself from inquiries regarding the operation of the Charities by federal and state agencies.

13.     Defendant SAILORS directed the Charities to enter into contracts with the Management Companies. These contracts were prepared by Defendant SAILORS. In these contracts, the Charities agreed to pay management fees to the Management Companies of $30,000 a month or more for the services of the Management Companies. At the direction of defendant SAILORS, the officers and directors of the Charities approved and executed the management contracts and paid the management fees without any negotiations and without exercising any due diligence or considering any other options.

14.     The Nominee President and Individual 1 performed few, if any, services for the Management Companies and only at the direction of defendant SAILORS. The Nominee President was paid a fee of several thousand dollars per month to allow the Nominee President's name to be used as the alleged president of ACM and to perform ministerial duties, such as forwarding mail, including inquiries from various Attorney General offices, and any telephone inquiries. At the direction of defendant SAILORS, Individual 1 received a salary of $5,000 per month, even though

she provided almost no services for the Management Companies, and continued to receive this salary for a period after she was no longer an officer and had no association with ACM.

16.    15.    The substantial fees paid by the Charities to the Management Companies owned and controlled by defendant SAILORS were used to fund his lavish lifestyle including a boat, luxury cars, and the rental and purchase of luxury homes.  Defendant SAILORS also falsely informed the Charities' bookkeeper that the daily expenses incurred by defendant SAILORS and Individual 1, such as expensive meals and entertainment activities were business expenses incurred on behalf of the Charities.

C.    **Reasonableness of Management Fees and Opinion Letters**

16.    The management fees paid by the Charities to the companies owned and controlled by defendant SAILORS were $30,000 a month or more.  The Charities' tax preparer and the agencies responsible for the regulation of charitable organizations began to question the reasonableness of these management fees.  Defendant SAILORS hired corrupt accountants and lawyers to issue fraudulent and deceptive opinion letters stating that the fees paid to the Management Companies by the Charities were reasonable.  Defendant SAILORS drafted and prepared the false and fraudulent opinion letters.

i.    **Accountant 1**

17.    In or about 2012, defendant SAILORS solicited an accountant (hereinafter referred to as "Accountant 1") to issue a false opinion letter stating that the management fees paid by DVS to FUM during 2011 were reasonable.

18.    Defendant SAILORS paid Accountant 1 approximately $500 for the issuance of the opinion letter.

19.     In order to facilitate the preparation of the false opinion letter, defendant SAILORS sent a draft of an opinion letter for Accountant 1 and edited the opinion letter drafted by Accountant 1.

20.     In or about 2016, defendant SAILORS again asked Accountant 1 to issue a false opinion letter regarding the reasonableness of the management fees paid by CCAI during 2016 to ACM.  Defendant SAILORS caused the Charities to pay Accountant 1 approximately $600 for the issuance of this second opinion letter.

21.     Accountant 1 signed the opinion letters understanding  that the opinion letters contained false statements regarding the alleged reasonableness of the fees charged by the alleged management companies to the Charities.

22.     Defendant SAILORS did not tell Accountant 1 what the opinion letters were to be used for, but Accountant 1 knew it was for "something fishy." Instead, Defendant SAILORS utilized the opinion letters of Accountant 1 to mislead the tax preparer regarding the reasonableness of the management fees.

                    ii     **Attorney 1**

23.     In or about 2013, defendant SAILORS solicited an attorney (hereinafter referred to as "Attorney 1") to issue a false opinion letter stating that the management fees paid by DVS to FUM during 2012 were reasonable.

24.     Defendant SAILORS agreed to pay Attorney 1 approximately $3,000 for the issuance of the false opinion letter and other matters.

25.     In order to facilitate the preparation of the false opinion letter, defendant SAILORS sent a copy of the opinion letter previously issued by Accountant 1, which Attorney 1 redrafted.

26.     Defendant SAILORS directed Attorney 1 to falsely state that the opinion letter was issued at the request of the president of DVS.

27.     In or about December 2014, defendant SAILORS requested that Attorney 1 issue two additional false opinion letters regarding the reasonableness of the management fees paid by DVS to ACM during 2014 and CCAI to ACM during 2014.

28.     Attorney 1 signed the opinion letters understanding that the opinion letters contained false statements regarding the reasonableness of the fees charged by the alleged management companies to the Charities.

29.     Attorney 1 was told by defendant SAILORS that the opinion letters of Attorney 1 were for the files and never to be used in any capacity. Instead, the opinion letters were used to mislead the tax preparer and the bookkeeper for DVS and the Internal Revenue Service which was auditing DVS.

        iii.     **Attorney 2**

30.     In or about 2017, defendant SAILORS solicited an attorney (hereinafter referred to as "Attorney 2") to issue a false opinion letter stating that the management fees paid by CCAI to ACM during 2015 were reasonable.

31.     Defendant SAILORS agreed to pay Attorney 2 approximately $3,200 for the issuance of the false opinion letter and other matters.

32.     In order to facilitate the preparation of the false opinion letter, defendant SAILORS sent a copy of the opinion letter previously issued by Attorney 1, which Attorney 2 copied almost verbatim.

33.     Defendant SAILORS directed Attorney 2 to falsely state that the opinion letter was issued at the request of the president of CCAI.

34.     Attorney 2 signed the opinion letter understanding that the opinion letter contained false statements regarding the alleged reasonableness of the fees charged by the alleged management company to the Charities.

35.     Attorney 2 was told by defendant SAILORS that the opinion letter was to be utilized for the CCAI's annual state registration filings.   Instead, the opinion letter of Attorney 2 was used to mislead others regarding the reasonableness of the management fees, including the tax preparer.

        iv.     **Accountant 2**

36.     In or about 2018, defendant SAILORS solicited an accountant (hereinafter referred to as "Accountant 2") to issue a false opinion letter stating that the management fees paid by CCAI during 2016 were reasonable.  Defendant SAILORS needed the opinion letter due to an ongoing lawsuit filed by the Florida Attorney General alleging fraud in the operation of CCAI and its officers and directors.

37.     Defendant SAILORS agreed to pay Accountant 2 approximately $5,000 for the issuance of the false opinion letter.

38.     Accountant 2 signed the opinion letters understanding that the opinion letters contained false statements regarding the alleged reasonableness of the fees charged by the alleged management company.

39.     Accountant 2 understood that defendant SAILORS utilized the opinion letter of Accountant 2 to mislead the Florida Attorney General and others regarding the reasonableness of the management fees, including the tax preparer and the bookkeeper for CCAI, other state agencies investigating CCAI, and the officers and directors of CCAI.

D.      **Other Fraudulent Acts by Defendant Sailors and Attorney 1**

40.     In or about 2014, the IRS conducted a civil audit of DVS.  Defendant SAILORS

hired Attorney 1 to obstruct the investigation and ensure that the IRS did not receive truthful

information regarding the operations of DVS.

41.     In or about 2016, when CCAI was being sued in a civil matter by a third party,

defendant SAILORS paid Attorney 1 to fraudulently pose as the compliance officer for CCAI in

order to obstruct the lawsuit brought against the charity.  As defendant SAILORS well knew,

Attorney 1 was never the compliance officer for CCAI and had no knowledge of the day-to-day

operations of CCAI.  At the request of defendant SAILORS, Attorney 1 provided fraudulent

testimony in two civil depositions, under oath and penalties of perjury.

E.      **Gifts-In-Kind**

42.     Of the total cash donations received by the Charities, only approximately ½ to 1

percent was distributed to further the stated mission of the Charities.  Most of the money donated

by the public was paid to the Charity Solicitor or to the Management Companies controlled by

SAILORS.  Defendant SAILORS used the money paid to the Management Companies for his

personal gain.

43.     In furtherance of the scheme to defraud, defendant SAILORS wanted to increase

the perceived percentage of the Charities' distributions since a low distribution Ratio could have

a negative effect on cash donations.

44.     One way to increase the distribution Ratio was through the use of gifts-in-kind.

Beginning in or about 2009, defendant SAILORS negotiated agreements on behalf of the Charities

whereby the Charities would substantially increase their Ratio by paying a co-conspirator broker

(hereinafter referred to as the "Gifts-In-Kind Broker") to ship goods to other charities in the United States and in foreign countries.

45.     Defendant SAILORS and the Gifts-In-Kind Broker knew that the Charities could only increase their ratio: if the Charities took actual possession and control of the goods; the Charities actually selected the recipients of the goods; and the goods conformed to the mission of the Charities.

46.     Defendant SAILORS and the Gifts-In-Kind Broker fraudulently increased the Charities' Ratios by falsely reporting the gifts-in-kind on the tax returns of the Charities even though the Charities never took possession and control of the goods.

47.     In furtherance of the fraud, the Gifts-In-Kind Broker and defendant SAILORS, selected the actual beneficiaries of the charitable gifts (*i.e.,* foreign hospitals), without regard to public benefit and solely to facilitate the fraudulent scheme.  The foreign hospitals were selected by the Gifts-In-Kind-Broker based upon their willingness to accept the goods without question or scrutiny and regardless of medical need.

48.     Defendant SAILORS and the Gifts-In-Kind Broker agreed to ship goods to places and for purposes that were not in furtherance of the mission of the charity, such as shipping goods to Sierra Leone, Africa on behalf of DVS, allegedly in support of disabled veterans, in order to falsely increase the Ratio.

49.     Defendant SAILORS, in order to increase the Ratio, would request that the Gifts-In-Kind Broker ship certain goods, such as pharmaceuticals, outside the United States on behalf of the Charities, as such goods would cause a large increase in the Ratio.

50.     In exchange for his participation in the fraud, the Gifts-In-Kind Broker received thousands of dollars in payments from the Charities, as directed by defendant SAILORS.

F.    **Disbursement of Charity Funds**

51.    In order to create the appearance of legitimacy, defendant SAILORS understood that some amount of funds fraudulently obtained by the charities would have to be donated each year to charity recipients. In furtherance thereof, defendant SAILORS directed the charity president to research and select well known medical and academic institutions. Pursuant to the scheme to defraud, defendant SAILORS determined the amount of charity funds to be donated to such institutions based upon the amount of funds remaining in the charities' bank accounts at the end of the year.  Defendant SAILORS approved the donation of funds only after ensuring that there would be sufficient funds to pay his management fees.

G.    **Nominee Corporations and Trusts**

52.    Defendant SAILORS caused the establishment of HMDM, a purported charity management company used to further the fraudulent activities and to conceal defendant SAILORS' receipt of criminal proceeds.  Defendant SAILORS also caused the establishment of the SO Trust and Palmer Trust in order to conceal his ownership of HMDM.

H.    **Nurse Placement International (NPI)**

53.    In or about 2016, the Gifts-In-Kind Broker suggested to defendant SAILORS that CCAI contribute cash directly to a cancer hospital in the Dominican Republic (hereinafter referred to as the "Cancer Hospital") to pay the salaries of nurses in order to make the Charities appear more legitimate and substantial.

54.    The Gifts-In-Kind Broker told defendant SAILORS that the cost of each nurse was approximately $300 - $400 per month, and the two agreed that the Gifts-In-Kind Broker would be paid $700 per month for his assistance. Defendant SAILORS and the Gifts-In-Kind Broker agreed that defendant SAILORS would tell the officers and directors of CCAI to pay for four nurses for

the Cancer Hospital. The total monthly cost of this expense was $1600 for the nurses and $700 for the Gifts-In-Kind Broker.

55. Defendant SAILORS told the officers and directors of CCAI that CCAI needed to pay $12,000 to NPI for four nurses at the Cancer Hospital.

56. HMDM conducted business under the fictitious name NPI. Defendant SAILORS did not inform the officers and directors of CCAI that NPI was a fictitious name for HMDM. HMDM is owned by the SO Trust and Palmer Trust. Defendant SAILORS and Individual 1 are the beneficiaries of these trusts.

57. Beginning in or about mid-2016, pursuant to the instructions of defendant SAILORS, the officers and directors of CCAI agreed to pay $12,046 to NPI on a monthly basis. In exchange, the Gifts-In-Kind Broker forwarded monthly reports detailing the hours the nurses worked to defendant SAILORS. Each month thereafter, CCAI paid NPI approximately $12,000. At the direction of defendant SAILORS, the accountant for NPI then issued a check from NPI to HMDM for $12,000. From this amount, HMDM paid monthly $400 per nurse (four nurses $1,600) to the Cancer Hospital and $700 to the Gifts-In-Kind Broker. Defendant SAILORS, through HMDM, and unbeknownst to the CCAI officers and directors, retained the remaining funds of approximately $9,700 per month as a management fee.

58. Other than receiving, via email, the weekly time reports for the Cancer Hospital nurses from the Gifts-In-Kind Broker, neither defendant SAILORS nor HMDM performed any other service on behalf of NPI in return for the $9,700 monthly fee.

59. In or about September 2016, defendant SAILORS decided that CCAI should pay for 8 nurses at the Cancer Hospital at a cost of $500 per nurse per month. Based on the increase in the number of nurses, defendant SAILORS directed the officers and directors of CCAI to raise

the fee paid to NPI for the nurses from $12,046 to $24,092, based upon the fraudulent pretense that the additional money was needed to cover the increased monthly salary of the eight nurses.

60.     Each month thereafter, CCAI paid NPI $24,092.  At the direction of defendant SAILORS, the accountant for NPI then issued a check from NPI to HMDM for $24,092.  From this amount, HMDM paid monthly $500 per nurse (eight nurses $4,000) to the Cancer Hospital and $700 to the Gifts-In-Kind Broker.  Defendant SAILORS, through HMDM, and without the knowledge of the CCAI officers and directors, retained the remaining funds of approximately $19,000 per month.   Neither defendant SAILORS nor the management company HMDM performed any other service on behalf of NPI in return for the $19,000 monthly fee.

61.     During the approximate two-year time frame CCAI paid for nurses at the Cancer Hospital as part of its charitable mission, the nurses received a total of $53,000 for their work.  The Gifts-In-Kind Broker received $9,700.  HMDM, the management company owned by defendant SAILORS through his trusts, received over $450,000.

I.      **Obstruction**

62.     Defendant SAILORS attempted to obstruct both the federal criminal investigation and the civil investigation of the Florida Attorney General by means of fraud and the facilitation of false and perjurious testimony.

63.     Defendant SAILORS attempted to influence a witness to falsely state, among other things, that the officer and/or director sought out other management companies but could not find any other management companies offering the services of ACM.

64.     Defendant SAILORS attempted to influence a witness by falsely stating to a witness, among other things, that any instructions conveyed by defendant SAILORS were as a result of instructions given by the officers of the Charities.

23

65.     Defendant SAILORS attempted to indirectly influence a witness by having a person state to the witness that the witness should not mention defendant SAILORS at the deposition, and that all matters of the Charities were reviewed and discussed with counsel.

66.     After being contacted by the Attorney General's Offices from various states, defendant SAILORS instructed persons to obstruct their inquiries by being unresponsive to the document requests.

J.      **Forming and Managing PACs to Facilitate the Fraud**

67.     In order to circumvent the scrutiny of the State Attorney General Offices that regulate charities, and to continue and to facilitate the scheme to defraud, defendant SAILORS established several PACs.

68.     Defendant SAILORS understood that the PAC's were not subject to the scrutiny and regulations concerning charities.

69.     Defendant SAILORS used the pre-existing manner and means of the charity fraud to establish and operate fraudulent PACs, such as the above-described nominee officials, call center solicitations and alleged consulting and management companies.

70.     Defendant SAILORS solicited the above-described Attorney 2 to act in the capacity of PAC president based upon Attorney 2's inexperience and willingness to comply with the instructions of defendant SAILORS.

71.     Defendant SAILORS use of the PACs to continue the scheme to defraud was a mechanism to conceal defendant SAILORS' participation therein and to generate large amounts of criminally generated funds.

### K.      **Use of Fraud Proceeds**

72.      Defendant SAILORS used the proceeds from the fraud to fund his lavish lifestyle. From 2013 through 2018, defendant SAILORS also made approximately $1,125,000 in contributions to his defined benefit pension plan from the proceeds of the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO - FOUR

## GENERAL ALLEGATIONS

### A.      **Unlawfully Dissipating Assets of his Defined Benefit Plan**

1.      In order to encourage persons to plan for retirement, the Internal Revenue Code provides a tax deduction, up to certain limits, for amounts contributed to a defined benefit pension plan.

2.      In order to prevent the contributions to the defined benefit plan from being dissipated, the Internal Revenue Code prohibits persons from dealing with the income or assets of a plan in their own self-interest.  The Internal Revenue Code limits loans from the plan and provides strict rules that govern such loans.

3.      Each year a defined benefit plan must file a Form 5500 with the IRS, which sets forth, among other items, the contributions made or to be made to the plan, the assets and liabilities of the plan, the loans made to and from the plan, and whether the plan has made any prohibited transactions.

4.      From in or about 2013 through 2018, defendant SAILORS employed a firm to manage the plan and prepare the Form 5500 for his signature.  In order to administer the plan and accurately report on the Form 5500 contributions made to the plan along with distributions or loans

withdrawn from the plan, each year the firm sent defendant SAILORS a questionnaire, which defendant SAILORS completed and signed.

5.      From 2013 through 2018, defendant SAILORS deducted approximately $1,125,000 in contributions to his defined benefit pension plan on his individual federal income tax return.

6.      Each year after making the contributions defendant SAILORS unlawfully withdrew some or all of the funds.

7.      Each year, Defendant SAILORS was sent a questionnaire by the plan administrator for Defendant SAILORS' defined benefit pension plan. The questionnaire was utilized by the plan administrator in order to accurately report all financial aspects of the plan, including contributions and distributions from the plan to the IRS through a Form 5500, Annual Return of One-Participant Retirement Plan. Defendant SAILORS falsely completed the questionnaire by stating, amongst other false statements, the following:

a.      that he did not control or manage any other business, when, in fact defendant SAILORS controlled and managed DVS, CCAI, FUM, HMDM, and NCA;

b.      that there were no participant loans during the plan year, when in fact, defendant SAILORS made hundreds of thousands of dollars of loans and/or distributions to or for himself from the plan;

c.      that no plan investment transaction involved a party-in-interest, when in fact, many of the investments involved loans to himself or companies he owned or had an interest in, including HMDM;

d.      that no loans were in default or uncollectible at the plan year-end, when in fact, most of the loans were uncollectible;

e.      defendant SAILORS falsely listed the nature, character, and amount of the plan assets on the plan asset summary;

f.      defendant SAILORS falsely stated the actual amount that he contributed to the plan; and

g.      defendant SAILORS falsely signed the first page of the questionnaire by stating that he provided "complete and accurate data."

8.      By providing false information to the plan administrator through the questionnaire, defendant SAILORS caused the plan administrator to prepare a false Form 5500 which was then signed under penalties of perjury by defendant SAILORS and filed with the IRS.

9.      Through numerous unlawful transactions, including his unreported self-dealing and engaging in otherwise prohibited transactions, defendant SAILORS dissipated the assets of the defined benefit plan to approximately $201,327 as of December 31, 2017.

## COUNT TWO

(Subscribing to a False Tax Return)
**(26 U.S.C. § 7206(1))**

1.      The General Allegations Section of Counts Two through Four is hereby re-alleged and expressly incorporated as if set forth herein.

2.      On or about October 13, 2016, in Broward County, in the Southern District of Florida and elsewhere, the defendant,

### DOUGLAS SAILORS,

a resident of Parkland, Florida, did willfully make and subscribe to a United States Individual Income Tax Return, Form 1040, for tax year 2015, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter.  Within the Form 1040, which was filed with the Internal Revenue

Service, the defendant failed to report as gross income amounts withdrawn from the Douglas W. Sailors' Defined Benefit Pension Plan and falsely claimed as deductions from gross income alleged contributions to the Douglas W. Sailors' Defined Benefit Pension Plan, and thus understated the amount of adjusted gross income and tax due and owing.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT THREE

(Subscribing to a False Tax Return)
**(26 U.S.C. § 7206(1))**

1.      The General Allegations Section of Counts Two through Four is hereby re-alleged and expressly incorporated as if set forth herein.

2.      On or about October 11, 2017, in Broward County, in the Southern District of Florida and elsewhere, the defendant,

## DOUGLAS SAILORS,

a resident of Parkland, Florida, did willfully make and subscribe to a United States Individual Income Tax Return, Form 1040, for tax year 2016, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter. Within the Form 1040, which was filed with the Internal Revenue Service, the defendant failed to report as gross income amounts withdrawn from the Douglas W. Sailors' Defined Benefit Pension Plan and falsely claimed as deductions from gross income alleged contributions to the Douglas W. Sailors' Defined Benefit Pension Plan, and thus understated the amount of adjusted gross income and tax due and owing.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT FOUR

(Subscribing to a False Tax Return)
### (26 U.S.C. § 7206(1))

1.       The General Allegations Section of Counts Two through Four is hereby re-alleged and expressly incorporated as if set forth herein.

2.       On or about October 15, 2018, in Broward County, in the Southern District of Florida and elsewhere, defendant,

### DOUGLAS SAILORS,

a resident of Parkland, Florida, did willfully make and subscribe to a United States Individual Income Tax Return, Form 1040, for tax year 2017, which was verified by a written declaration that it was made under the penalties of perjury and which he did not believe to be true and correct as to every material matter.  Within the Form 1040, which was filed with the Internal Revenue Service, the defendant failed to report as gross income amounts withdrawn from the Douglas W. Sailors' Defined Benefit Pension Plan and falsely claimed as deductions from gross income alleged contributions to the Douglas W. Sailors' Defined Benefit Pension Plan, and thus understated the amount of adjusted gross income and tax due and owing.

In violation of Title 26, United States Code, Section 7206(1).

### FORFEITURE ALLEGATION
### Conspiracy to Commit Mail Fraud and Wire Fraud

1.       Upon conviction of Count 1, an offense in violation of Title 18, United States Code, Section 1349, the defendant, DOUGLAS SAILORS, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violation. The property to be forfeited includes, but is not limited to, the following:

A. The sum of $22,000,000, which represents the amount of proceeds which constitutes or was derived from Count 1 of this Indictment; and

B. The residence located at 1718 Griffith Avenue, Owensboro, Kentucky, 42301-3507 further described as Lots No 5 and 6 in Block A in what is known as the Griffithdale Subdivision to the City of Owensboro, Kentucky, a plat of which subdivision is of record in said Clerk's Office in Deed Book 112 at page 449.

2.      If any of the property described above, as a result of any act or omission of

defendant DOUGLAS SAILORS,

          a.      cannot be located upon the exercise of due diligence;

          b.      has been transferred or sold to, or deposited with, a third party;

          c.      has been placed beyond the jurisdiction of the court;

          d.      has been substantially diminished in value; or

          e.      has been commingled with other property which cannot be divided without difficulty,

then the United States of America shall be entitled to forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code,

Section 2461(c).

A TRUE BILL

FOREPERSON

J. VAGLIENTI
for JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

PAUL F. SCHWARTZ
ASSISTANT UNITED STATES ATTORNEY

JEFFREY KAPLAN
ASSISTANT UNITED STATES ATTORNEY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

v.

DOUGLAS SAILORS,

_____/
**Defendant.**

CASE NO.: _____

**CERTIFICATE OF TRIAL ATTORNEY\***

**Superseding Case Information:**

New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of New Counts _____

**Court Division** (select one)
- ☐ Miami
- ☑ FTL
- ☐ Key West
- ☐ WPB
- ☐ FTP

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) **No**
   List language and/or dialect: _____

4. This case will take **10** days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)
   - I   ☐ 0 to  5 days
   - II  ☑ 6 to 10 days
   - III ☐ 11 to 20 days
   - IV  ☐ 21 to 60 days
   - V   ☐ 61 days and over

   (Check only one)
   - ☐ Petty
   - ☐ Minor
   - ☐ Misdemeanor
   - ☑ Felony

6. Has this case been previously filed in this District Court? (Yes or No) **No**
   If yes, Judge _____ Case No. _____

7. Has a complaint been filed in this matter? (Yes or No) **No**
   If yes, Magistrate Case No. _____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) **No**
   If yes, Judge _____ Case No. _____

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) **No**

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) **No**

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) **Yes**

By: _____

Jeffrey N. Kaplan
Assistant United States Attorney
Court ID No.      5500030

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

Defendant's Name: _____ **DOUGLAS SAILORS** _____

Case No: _____

Counts #: 1

Conspiracy to Commit Mail Fraud and Wire Fraud

Title 18, United States Code, Section 1349
* **Max. Penalty:**   20 years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**
* **Max. Supervised Release:**   3 years'
* **Max. Fine:**   the greater of $250,000 fine or twice the amount of gross gain or gross loss

Counts #: 2-4

Subscribing to a False Tax Return

Title 26, United States Code, Section 7206(1)
* **Max. Penalty:**   3 years' imprisonment
* **Mandatory Min. Term of Imprisonment (if applicable):**
* **Max. Supervised Release:**   1 year
* **Max. Fine:**   $250,000

**\*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**